Eddie Lee MILLER *v.* STATE of Arkansas

CR 79-80                                        605 S.W. 2d 430
Supreme Court of Arkansas
Substituted Opinion on Rehearing
delivered October 6, 1980

342

*Bill E. Ross*, for appellant.

*Steve Clark*, Atty. Gen., by: *Joseph H. Purvis*, Deputy Atty. Gen., for appellee.

JOHN F. STROUD, Justice. Appellant was convicted of capital murder in the robbery and killing on November 3, 1978, of W. F. Bolin, a Blytheville shopkeeper, and sentenced to death by electrocution. Alleging numerous constitutional and procedural irregularities as points for reversal, appellant brings this appeal. Finding no error, we affirm the conviction and the sentence of the jury.

## POINT I

### THE COURT ERRED IN FAILURE TO GRANT APPELLANT'S MOTION TO SUPPRESS EVIDENCE SEIZED UNDER THE AUTHORITY OF A SEARCH WARRANT.

Appellant contends there was not probable cause to justify the issuance of the search warrant and any evidence seized pursuant to it should have been suppressed. The Blytheville Chief of Police, R. J. Cox, contacted Judge A. S. Harrison in Jonesboro during the evening of November 3 and

presented the judge with his affidavit and testimony tending to support the issuance of the search warrant for the home and automobile of appellant. Appellant had been arrested earlier that day pursuant to an arrest warrant, the validity of which was not challenged by appellant. When the officers went to appellant's house shortly after the killing with a warrant for his arrest, they were unable to gain entrance. Appellant's wife was next door and she finally admitted that appellant was in the house, but she said her keys were locked up in the house. As the officers were unable to elicit a response from appellant, they forced open the front door. Appellant was hiding in the attic, but came down and was taken into custody. Chief of Police Cox stated in his affidavit for a search warrant that the circumstances led him to believe that appellant had concealed the murder weapon and money in the attic where he had been hiding immediately prior to his arrest. The affidavit recited the robbery and murder of W. F Bolin earlier that day, the forced entry of the residence pursuant to the arrest warrant, the surrender of appellant from the attic without an officer making entry into the attic, and the discovery of a sawed-off shotgun in plain view in the house. Appellant argues that the affidavit contains conclusions of the police chief rather than facts upon which the judge could make an independent determination of reasonableness. An affidavit for a search warrant must contain affirmativeness allegations of fact, not mere affirmations of suspicion, from which the judge may independently decide for himself whether there is probable cause for the search. *Ferguson* v. *State*, 249 Ark. 38, 458 S.W. 2d 383 (1970). The judge must not merely accept without question the conclusions of the officer. *Walton & Fuller* v. *State*, 245 Ark. 84, 431 S.W. 2d 462 (1968). But the affidavits for search warrants must be tested and interpreted by courts in a commonsense and realistic fashion. *United States* v. *Ventresca*, 380 U.S. 102, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965); *Cary* v. *State*, 259 Ark. 510, 534 S.W. 2d 230 (1976).

Both Chief of Police Cox and Judge Harrison were entitled to rely on the validity of the warrant of arrest, as the warrant was valid on its face and the attorney for appellant did not challenge its validity. We also find that Judge Harrison had sufficient information from the affidavit and

sworn testimony upon which to base his finding that there was reasonable cause to believe the evidence sought would be found in appellant's house or automobile. Appellant urges that the search warrant was illegally issued because Judge Harrison considered information other than that contained in the affidavit and sworn testimony. However, a reading of the transcript clearly indicates although he did receive other information concerning the urgent need for a nighttime search, his determination of probable cause for issuance of the search warrant was based only on the affidavit and the sworn testimony.

Appellant also contends that the warrant should not have been issued for nighttime hours. Rule 13.2(c) of the Arkansas Rules of Criminal Procedure provides that search warrants shall be executed between 6:00 a.m. and 8:00 p.m. except for stated exceptions. One of the exceptions is when the objects to be seized are in danger of imminent removal. Rule 13.2(c) (ii). The officers were so concerned, following the arrest of appellant, that his wife would dispose of the murder weapon and hide the stolen money that they left officers at the home for several hours awaiting the search warrant. Inasmuch as the officers would likely have been justified in searching the attic incident to the arrest without a search warrant pursuant to Rule 12.5, we think they demonstrated commendable restraint in deferring the attic search until the search warrant issued. There was ample evidence of imminent removal of the objects of the search to warrant Judge Harrison to authorize a nighttime search. It is also rather ridiculous to suggest that the officers should have continued to watch the entrance to the attic until 6:00 a.m. so a daylight search could be made.

## POINT II

THE TRIAL COURT ERRED IN NOT EXCLUDING STATEMENTS ALLEGED TO HAVE BEEN OBTAINED FROM APPELLANT AFTER CONFRONTATION WITH EVIDENCE OBTAINED BY AN UNLAWFUL SEARCH AND SEIZURE.

Appellant bases this argument solely on the "fruit of the

poisonous tree" doctrine set out in *Wong Sun* v. *U.S.*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), where evidence obtained as a result of earlier unlawful acts was held to be "tainted" by the previous illegality and, therefore, inadmissible. However, as we have previously upheld the search of appellant's house, this argument must fall. Since the tree was not "poisonous," neither was the fruit.

## POINT III

### THE COURT ERRED IN NOT SUSTAINING THE OBJECTION TO THE ARGUMENT OF THE DEPUTY PROSECUTING ATTORNEY IN THE CLOSING OF THE PENALTY STAGE OF THE APPELLANT'S TRIAL.

Appellant's point for error is due to the following argument of the Deputy Prosecuting Attorney in the closing of the penalty stage of appellant's trial:

> I don't think that you can lay down at night, sleep knowing that you have allowed this man to live with the possibility of escaping again. He has already escaped once. He is an escapist.

> Ladies and gentlemen, I don't mean to create fear in you, but if you did do that, sentence him to life imprisonment with his having escaped once already and plan on holding him in any institution, I don't care what kind of institution it is, any institution for forty years or better, you are taking a terrific risk.

Appellant's counsel did not request the court to admonish the jury concerning these remarks. He did move for a mistrial based on them, but this motion was denied by the trial court. Appellant contends that the only logical inference that can be drawn from the statements is that the deputy prosecutor was telling the members of the jury that their lives would be in danger unless they sentenced appellant to death. However, the deputy prosecutor went on to explain that he was interrupted and that he was about to explain that the risk would be to members of society in general, not to the members of the jury. The trial court accepted this explanation, and, as noted, denied appellant's motion for mistrial.

We will not reverse the action of the trial court in matter pertaining to its controlling, supervising, and determining the propriety of the arguments of counsel in the absence of manifest gross abuse. *Rowland* v. *State*, 263 Ark. 77, 562 S.W. 2d 590 (1978); *Perry* v. *State*, 255 Ark. 378, 500 S.W. 2d 387 (1973).

Had appellant's counsel requested the court to admonish the jury, the question of refusal would have been presented, but the failure to give an admonitory instruction is not prejudicial error in the absence of a request. *Petron* v. *State*, 252 Ark. 945, 481 S.W. 2d 722 (1972); *Clark* v. *State*, 246 Ark. 1151, 442 S.W. 2d 225 (1969). Prior to the closing arguments, the court had given the jury an instruction that "closing arguments of the attorney are not evidence" and that "remarks of attorneys having no basis in the evidence should be disregarded by you." We find no abuse of discretion by the trial court in denying appellant's motion for a mistrial. A mistrial is an extreme and drastic remedy which should be resorted to only when there has been an error so prejudicial that justice could not be served by continuing the trial. *Limber* v. *State*, 264 Ark. 479, 572 S.W. 2d 402 (1978); *Holmes* v. *State*, 262 Ark. 683, 561 S.W. 2d 56 (1978).

## POINT IV

### THE COURT ERRED IN ALLOWING THE JUDGMENTS OF CONVICTION REFLECTING A NON EXISTING CRIME AT THE TIME OF THE OCCURRENCE TO BE INTRODUCED BY THE STATE AS AGGRAVATING CIRCUMSTANCES.

In 1971 appellant had pleaded guilty to several charges of "armed robbery" and these convictions were brought out by the State on cross-examination of appellant, who freely admitted the convictions. Appellant now asserts that since there was no crime technically labeled "armed robbery" when he pleaded guilty to those charges in 1971, the State should not be able to introduce the judgments of conviction as aggravating circumstances in the penalty stage of the present case. Also, appellant maintains that since the convictions were brought out during the guilt/innocence phase of his trial, they should not be brought out again in the penalty phase because this would be cumulative and repetitious and

solely for the purpose of inflaming the jury. Appellant is mistaken on both of these contentions. The time to challenge the technical accuracy of the judgments of conviction for "armed robbery" would have been in 1971, not in 1978. It is also difficult to imagine that appellant would have pled guilty to "armed robbery" if he had not used a weapon during the perpetration of the robbery. Further, the fact that appellant hads previously admitted the convictions on cross-examination removed any possible prejudice from the State's later introduction of them during the penalty phase of the trial.

## POINT V

### THE TRIAL COURT ERRED IN DISMISSING CERTAIN VENIREMEN AS PROSPECTIVE JURORS BECAUSE OF THEIR ATTITUDE TOWARD CAPITAL PUNISHMENT.

Appellant contends that several prospective jurors who had general objections to the death penalty were wrongly excluded from the jury in violation of the rule laid down in *Witherspoon* v. *Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). That rule provides, in essence, that unless a prospective juror clearly states that he would automatically vote against the imposition of the dealth penalty, regardless of the evidence adduced during the trial, he cannot be excused from the jury for cause.

It is no easy task for the trial court to ascertain which jurors are irrevocably opposed to the death penalty and which merely have religious or conscientious scruples in opposition to it. There are no magic words. It is not the phrasing of the questions or answers used in this area that is important; rather, it is the basic viewpoint of each juror on the possible imposition of the death penalty that is critical. The trial court must ascertain that each member of the jury will be open-minded at the outset of the trial and able to consider all the alternatives authorized by law. After reviewing the record of the *voir dire* of those prospective jurors excused due to their opposition to the death penalty, we are satisfied that these jurors were so irrevocably opposed to capital punishment that the trial court was not wrong in excluding them for that reason.

Appellant next contends that the "death qualification" of a juror is unconstitutional in that it results in a jury which is biased in favor of the prosecution, thus violating the Sixth and Fourteenth Amendments to the United States Constitution. As no proffer of evidence was made to support this contention, we think the treatment of this same contention was appropriately answered in *Witherspoon* v. *Illinois*, supra:

> We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction.

Appellant also contends that he was denied a fair trial due to the exclusion of many prospective jurors who were black. Appellant points out that of the 31 blacks on the jury panel, 28 were excluded for one reason or another. He argues that this fact clearly indicates that blacks were systematically excluded from the jury. Ten blacks were struck by the State in the exercise of its peremptory challenges, but it is interesting to note that appellant exercised all of his peremptory challenges to strike potential white jurors. The other blacks excluded were either excused by the court or challenged for cause. Eventually, a jury of nine whites and three blacks was seated and heard the case. There is no evidence here that any *class* of persons was deliberately and systematically excluded from the jury panel. Although appellant severely criticizes the use of the peremptory challenges by the prosecuting attorney, we have previously held that the mere fact that the state challenged all the blacks on the jury panel does not constitute a showing that his constitutional rights were violated. *Rogers* v. *State*, 257 Ark. 144, 515 S.W. 2d 79 (1974). The trial court has broad discretion in the conduct of a trial. We find no error on the part of the trial court in its supervision of the jury selection and no violation of appellant's constitutional rights in the make-up of that jury.

## POINT VI

IT IS A VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHTS TO LEAVE THE ABSOLUTE DISCRETION IN THE PROSECUT-

ING ATTORNEY TO DECIDE WHO TO FILE CAPITAL MURDER CHARGES ON AND WHETHER OR NOT TO WAIVE THE DEATH PENALTY AFTER GUILT-INNOCENCE STAGE IS CONCLUDED.

Appellant contends that leaving absolute discretion in the prosecuting attorney to file capital murder charges is a violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. We summarily rejected this argument, or one very similar to it, in *Giles* v. *State*, 261 Ark. 413, 549 S.W. 2d 479 (1977), cert. den. 434 U.S. 894 (1977). The United States Supreme Court has expressed its position on this question on several occasions. We think the following statement, in *Borkenkircher* v. *Hayes*, 434 U.S. 357, 364, 98 S. Ct. 663, 54 L. Ed. 2d 604, 611 (1978), is sufficiently clear on this question:

> In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion. Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, 'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'

### POINT VII

THERE WAS AN UNCONSTITUTIONAL EXCLUSION OF VENIREMEN FROM THE JURY PANEL.

Appellant alleges that the trial court erred in excusing several venirement from jury service at the outset of *voir dire*. After reviewing the reasons expressed by the 24 persons excused, we find no abuse of discretion by the trial court. There was no deliberate exclusion of a large class of eligible jurors as was true in *Hall* v. *State*, 259 Ark. 815, 537 S.W. 2d 155 (1976), where all farmers were excused. Here the court acted reasonably to excuse persons only "when the state of his

health or that of his family reasonably requires his absence; or when, for any reason, his own interests or those of the public will, in the opinion of the Court be materially injured by his attendance." Ark. Stat. Ann. § 39-107 (Supp. 1979).

## POINT VIII

### ARKANSAS CAPITAL MURDER STATUTES ARE UNCONSTITUTIONAL AS VIOLATIVE OF APPELLANT'S RIGHTS UNDER EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE 2, SEC. 9, OF THE CONSTITUTION OF ARKANSAS.

We have repeatedly rejected this same argument and upheld the constitutionality of our capital murder statutes. *Swindler* v. *State*, 267 Ark. 418, 592 S.W. 2d 91 (1979); *Pickens* v. *State*, 261 Ark. 756, 551 S.W. 2d 212 (1977), cert. den. 435 U.S. 909 (1978); *Collins* v. *State*, 261 Ark. 195, 548 S.W. 2d 106 (1977), cert. den. 434 U.S. 878 (1977). Accordingly, we find no merit to appellant's contentions.

## POINT IX

### PROPER LAW AND PROCEDURE WAS NOT FOLLOWED IN THE PENALTY STAGE OF APPELLANT'S TRIAL.

Appellant contends that the penalty phase of his trial was not properly conducted pursuant to Ark. Stat. Ann. § 41-1301 − 1304 (Repl. 1977). The first of these statutes provides for a bifurcated trial of persons charged with capital murder. If the defendant is found guilty of capital murder, the same jury sits again to hear additional evidence of aggravating and mitigating circumstances before determining sentence. Ark. Stat. Ann. § 41-1303 sets out seven possible aggravating circumstances to be considered by the jury and § 41-1304 enumerates six possible mitigating circumstances. The jury were properly provided a form to indicate their findings in regard to each of the possible aggravating circumstances and a separate form of the mitigating circumstances. They found four of the seven statutory aggravating circumstances applicable to the appellant in this case:

I. The defendant had, beyond a reasonable doubt,

previously committed another felony an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person.

II. The defendant did, beyond a reasonable doubt, in the commission of the capital felony murder knowingly create a great risk of death to a person other than the victim.

III. The defendant did, beyond a reasonable doubt, commit the capital felony murder for the purpose of avoiding or preventing an arrest or effecting an escape from custody.

IV. The defendant did, beyond a reasonable doubt, commit the capital felony murder for pecuniary gain.

The aggravating and mitigating circumstances to be considered by the jury in all applicable cases are set out in the statute, and are therefore not worded or tailored to fit the particular facts of the case just tried. As the statute does not indicate otherwise, the circuit judges of the state have been submitting to the jury in capital murder cases all seven of the enumerated aggravating circumstances and all six of the enumerated mitigating circumstances, regardless of the inapplicability of some of them. Ark. Stat. Ann. § 41-1303 (Repl. 1977). The practice was perhaps also bolstered by our Committee on Criminal Jury Instructions, because none of the aggravating or mitigating circumstances are bracketed in the model instruction, to indicate they might be omitted. We think it a better practice, and less confusing to the jury, for the circuit judge to omit from submission any aggravating or mitigating circumstances that are completely unsupported by any evidence, and we take this opportunity to direct the circuit judges of Arkansas to hereafter allow this alternate procedure. If there is any evidence of the aggravating or mitigating circumstances, however slight, the matter should be submitted to the jury. Of course, counsel may object to the determination of the trial court the same as they may object to any other form of verdict.

In this case, there were in the jury room twelve average citizens, not trained in the law, who were required to say

whether or not each of seven rigidly described aggravating circumstances existed. The jurors answered the questions, unanimously, as best they could. One of the reasons these statutes were enacted was to give this court an insight to the thought process of the jury so that we can compare the circumstances of cases involving the death sentence in our effort to avoid any arbitrary and unconstitutional application of the sentence. We do not consider the jury's findings as separate little verdicts, and we do not require the same degree of proof to sustain a jury finding that an aggravating or mitigating circumstance exists as we would require to sustain a conviction if that circumstance was a separate crime.

It is a matter of judgment whether the facts support the findings of the jury of aggravating and mitigating circumstances, but we will not substitute our judgment for the judgment of the jury that heard the evidence if there is a reasonable and understandable application of the facts to the statutory circumstances. The basic issue is whether, on the evidence, the jurors could sincerely and honestly have made the finding as *they* understood the question. If their answer to a question had been wholly arbitrary, a different problem would confront us. But here their answers were not arbitrary. We have before us a record of all the evidence presented to the jury to help us decide whether this jury acted capriciously in imposing the death sentence. We can put ourselves in the jurors' position and understand what they meant by answering the interrogatories as they did. That we might have interpreted an interrogatory differently does not require us to set aside a death sentence that was deliberately and conscientiously agreed upon by the persons who had the advantage of hearing the testimony as it was given.

Appellant's objection to the first aggravating circumstance found by the jury was covered in appellant's Point IV and we, therefore, here cover only the other three findings. The testimony relevant to a finding that appellant knowingly created a great risk of death to a person other than the victim was the testimony of Jim Hudson. Mr. Hudson, whose business was next to that of the deceased, testified that after hearing several shots and his neighbor's voice say "No, no!" followed by more shots, he entered the victim's premises and came face to face with appellant. He testified

appellant said, "You get in here," but instead he backed out of the door and stood outside hiding and shaking until he saw appellant exit with a gun in his hand a run up the alley. The jury could reasonably have found that appellant knowingly created a great risk of death to Mr. Hudson when he tried to get him inside the store. Having just murdered one man, it is not difficult to believe that appellant would have just as easily dispatched of Mr. Hudson to avoid leaving a witness to identify him.

The evidence presented on the question of whether or not appellant killed the deceased for the purpose of avoiding arrest primarily consists of certain relevant portions of his confession. It is obvious from the jury's finding that they believed appellant shot Bolin to remove him as a possible witness. They did not interpret the aggravating circumstance to be applicable only to capital felony murder committed by a defendant while he is attempting to escape from custody — an interpretation we cannot say is erroneous. Appellant stated that immediately prior to the shooting, thoughts of being identified by the deceased man ran through his mind. Although the remainder of this passage is somewhat hard to follow, it is inescapable that appellant was concerned about being identified by the deceased. Appellant stated in his confession that the deceased reached for an iron pipe and that was why he shot him, but investigation at the scene uncovered no iron pipe or any similar object. The jury could also take into consideration the lack of any other logical reason for the killing, such as revenge or accident. Once again, we think there was sufficient evidence for the jury to find beyond a reasonable doubt that appellant killed the deceased to eliminate a witness and thus hopefully avoid arrest for the robbery.

Appellant also contends that the jury's finding that appellant committed the murder for pecuniary gain was unsupported by the evidence. This contention merits little comment. Suffice it to say that there was more than sufficient evidence to support the jury's finding that one of the reasons appellant killed the deceased was to rob the store's cash register. We have previously held that this aggravating circumstance is not limited to a killing for hire, but is also clearly applicable to a murder committed during a robbery. *Giles v. State*, 261 Ark. 413, 549 S.W. 2d 479 (1977).

The jury found none of the statutory mitigating circumstances to be applicable to appellant and, although the form indicated the jury could write in any other mitigating circumstances, they found none to exist. Appellant contends that the jury erred in not finding two of the statutory circumstances to be applicable:

I. The capital felony murder was committed while the defendant was under extreme mental or emotional disturbance.

II. The capital felony murder was committed while the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect, intoxication, or drug abuse.

Appellant bases this contention on the report of the psychologist who evaluated him at the Arkansas State Hospital which stated:

... I conclude that Mr. Miller is not psychotic but is with serious emotional problems. I see his emotional problems in no way diminishing his competency to stand trial.

... My clinical interview and testing indicates that he is functioning at least in the borderline range of intelligence. Moreover, he is without organic dysfunction. There are indications that Mr. Miller has significant emotional problems, but no indication that these in any way interfere with his competency to stand trial. In my opinion, these test results are consistent with a diagnosis of an anti-social personality.

It is not strange that a person charged with capital murder would have a serious emotional problem, but there was no evidence that appellant was under an *extreme* mental or emotional disturbance at the time of the murder. There was also no evidence that appellant was under the influence of alcohol or drugs at the time of the murder, and the report clearly indicates that appellant *was capable* of appreciating the wrongfulness of his conduct and conforming that conduct to the requirements of the law. The jury was free to give the report the degree of credibility and persuasiveness they felt

appropriate, and they had the opportunity to observe appellant throughout the trial and hear his testimony and taped confession. We find no error in the jury's finding that none of the statutory mitigating circumstances were applicable to appellant.

Appellant also contends that the trial court erred in requiring the jury to list in writing any additional mitigating circumstances it might find. This contention is wholly without merit. The provision on the form for the listing of any additional mitigating circumstances was included as an added safeguard to defendants so that juries would not be limited in their consideration of circumstances that might call for leniency in sentencing. The latitude of a jury to list other mitigating circumstances in writing on the form is a benefit to a defendant and certainly not prejudicial. We find no error in the application of the law or in the procedures followed during the penalty stage of appellant's trial.

Finally, as required by Ark. Stat. Ann. § 43-2725 (Repl. 1977) and Rule 11(f) of the Rules of the Arkansas Supreme Court, we have reviewed the entire record for other reversible errors and, finding none, affirm the verdict and sentence of the jury.

Judgment affirmed.

FOGLEMAN, C.J., and PURTLE and MAYS, JJ., dissent.

JOHN A. FOGLEMAN, Chief Justice, dissenting. Upon further extensive review of the record in this case, I must agree with my Brother Purtle that the evidence was not sufficient to support a finding that Miller knowingly created a great risk of death to a person other than the victim, Bolin. A jury could not have found this circumstance to exist without gross speculation. Giving the evidence on this circumstance its strongest probative force when viewed in the light most favorable to the state, it could not be classified as more than a scintilla. In addition to the facts related in Justice Purtle's dissent, the only evidence the jury might possibly have considered to support this finding was Hudson's testimony that, when he was first confronted by Miller, who was holding the cash box in both hands and carrying it like it was a heavy object, Miller made a move and commanded, "You get in

here." Hudson demonstrated the move for the jury in a manner not disclosed by the record. Hudson never saw a weapon until Miller had come out the side door and had gone down the street toward an alley, moving away from Hudson at all times. Perhaps the move Miller made when holding the box was justifiably interpreted by Hudson as an indication that Miller was reaching for a concealed weapon. Still, the requirements of this particular aggravating circumstance are not met by a showing that the accused knowingly created a great *fear* of death by a person other than the victim; instead, Miller must have knowingly created a great *risk* of death to a person other than Bolin, i.e., Hudson. There is not the slightest indication that when Miller came out the side door that he ever saw, or even looked toward, Hudson. The only evidence in the case indicates that the gun Hudson saw Miller put in his belt was empty. In his incriminating statement, which was introduced in evidence, Miller said that the only four cartridges in the weapon were fired at Bolin before Hudson appeared. But even if an inference could be drawn that the weapon was loaded, there was no evidence that any effort to use it on Hudson was ever made by Miller. However favorably toward the state the jury viewed it, this evidence was not substantial to support a finding that Miller knowingly *created a great risk of death* to Hudson.

I cannot accept the approach of the majority in its substituted opinion that somehow we should not require the same test for substantial evidence to sustain a jury finding of an aggravating circumstance, on which the infliction of the death penalty may hinge, just because 12 average citizens, untrained in the law, perhaps confused by the submission of an aggravating circumstance for which there was no basis, did the best they could but still "deliberately and conscientiously" agreed upon a wrong answer in making a sincere and honest finding "as they understood it." The position taken by the majority to treat the jury's finding of the existence of an aggravating circumstance as something other than a "separate little verdict", which may be supported by evidence less than substantial, according to the usual tests, simply does not satisfy the requirements for a constitutionally imposed death penalty.

The test for substantial evidence is not met by evidence

which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences; it must be of sufficient force and character that it will, with reasonable and material *certainty and precision, compel* a conclusion, one way or another,; it must force or induce the mind to pass beyond a suspicion or conjecture. *Jones* v. *State*, 269 Ark. 119, 598 S.W. 2d 748 (1980). "Any" evidence is not substantial evidence; substantial evidence is valid, legal and persuasive evidence and it *must do more than create a suspicion* of the fact to be established. *Pickens-Bond Construction Co.* v. *Case*, 266 Ark. 323, 584 S.W. 2d 21.

I submit the majority has not used the test for substantial evidence. How certain and precise is evidence, which does not compel a conclusion, but merely permits an appellate court to say that the "issue is whether, on the evidence the jurors could have sincerely and honestly have made the finding as *they* understood the question" or to test for substantial evidence by putting its members in the jurors' position (as they understood it?) and understanding what the jury meant by answering this interrogatory as it did? If the majority finds the evidence to be substantial, it should demonstrate how it meets the test without resort to the extenuatory explanations given.

The basic concern expressed by the United States Supreme Court in *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) centered on defendants being condemned to death capriciously and arbitrarily. *Collins* v. *State*, 261 Ark. 195, 548 S.W. 2d 106, cert. den. 434 U.S. 878, 98 S. Ct. 231, 54 L. Ed. 2d 158, reh. den. 434 U.S. 977, 98 S. Ct. 540, 54 L. Ed. 2d 471 (1977). See also, *Gregg* v. *Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); *Proffit* v. *Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); *Jurek* v. *Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976); *Woodson* v. *North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944; *Roberts* v. *Louisiana*, 428 U.S. 325, 96 S. Ct. 3001, 49 L. Ed. 974 (1976).

We clearly recognized in *Collins* that a trial judge should impose life imprisonment without parole for a capital felony murder, "if he found that there was not sufficient evidence to

support the jury's finding on *any* aggravating circumstance enumerated in § 41-4711,[1] and that there was not sufficient evidence to support its finding that sufficient aggravating circumstances existed or that there were not sufficient mitigating circumstances to outweigh the aggravating circumstances, but there was sufficient evidence to support the finding of guilt." [Emphasis mine.] We also said in *Collins*, in reference to this court's power to reduce a sentence in death penalty cases, that "[t]here is a vast difference in reviewing a sentence for error (including error resulting from insufficient evidentiary support) in the sentencing procedure and reviewing a sentence resulting from a proper and legal sentencing procedure where sufficiency of evidence is not a basis for review." In *Collins*, we emphasized the importance of the jury's findings on aggravated circumstances, in imposing a death penalty which will pass constitutional examination and in avoiding arbitrary, capricious or freakish imposition of this extreme penalty. We said:

> *** If a guilty verdict is returned, the same jury in the sentencing phase of a bifurcated trial may then hear testimony tending to show one of more specifically enumerated groups of aggravating circumstances; but the death penalty cannot be imposed unless the jury unanimously finds, beyond a reasonable doubt, that one or more aggravating circumstance[s] exist (specifying in writing which of them does) and finds that aggravating circumstances outweigh any mitigating circumstances found to exist. **

In pointing out that there was a meaningful appellate review of the imposition of a death penalty, we stated:

> There is a meaningful appellate review by this court of the appropriateness of the death penalty in a particular case, considering both the punishment and any errors on points raised in the trial court, *including the sufficiency of the evidence to support any part of the jury verdict.* This appellate review includes: (1) a determination

---

[1]This was the controlling statute at the time of the *Collins* trial. The present corresponding statute is Ark. Stat. Ann. § 41-1303 (Repl. 1977).

whether the sentence was the result of passion, prejudice or any arbitrary factor; (2) *whether the evidence support the jury's finding of any statutory aggravating circumstances;* (3) whether the evidence supports the jury's findings on the question whether mitigating circumstances outweigh aggravating ones; (4) whether the sentence is excessive. On appellate review, this court can reduce the sentence, or grant a new trial, in its discretion, if the sentence is excessive or there is error affecting the sentence only, or where there is insufficient evidentiary support for the sentence. *** [Emphasis mine.]

We recognized in *Collins* that there is no specific requirement that this court compare sentences, but found that "the scope of permissible review of the sentence on appeal would necessarily require that we consult prior cases as precedent for our determining whether there was error in the sentencing procedure, *whether the evidence was sufficient to support any finding made by the jury,* whether any of the findings was the result of passion or prejudice or any other arbitrary factor and whether there had been an abuse of the discretion of either the jury or the trial judge in imposing the sentence." [Emphasis mine.] In *Collins*, we concluded:

> These sentencing and review procedures certainly leave no substantial risk that the death sentence will be imposed randomly, arbitrarily, capriciously, wantonly or freakishly, and tend to promote evenhanded, rational and consistent imposition of the death penalty.***

On the basis of this conclusion, review was denied by the United States Supreme Court at 434 U.S. 878, 98 S. Ct. 231, 54 L. Ed. 2d 158. The majority has now effectively sawed off one of the legs upon which that conclusion stood and has rendered our death penalty statute's constitutionality suspect.

The importance of the scope of appellate review outlined in *Collins* was given emphasis in *Neal* v. *State*, 261 Ark. 336, 548 S.W. 2d 135.[2] Not only did we point out that "it will at

---

[2]Cert. den. 434 U.S. 878, 98 S. Ct. 231, 54 L. Ed. 2d 158, reh. den. 434 U.S. 961; 98 S. Ct. 495, 54 L. Ed. 2d 322 (1977).

least be as easy to review the record to see if there is sufficient evidentiary support for a jury's findings on these particularized circumstances as it is when a jury's general finding of guilt is questioned," and we also pointed out that there was no necessity for a mechanism requiring a report from the trial judge and an accumulation of the records of all capital cases. The reason was that a review was meaningful when the appellate court undertook to "review a case in which a defendant is sentenced to die in the light of other *decisions* to determine whether the punishment was too great and taking its function to be to 'guarantee that the [aggravating and mitigating] reasons present in one case will reach a similar result to that reached under similar circumstances in another case.'" [Emphasis mine.]

I ask, how is an appellate review meaningful if the appellate court does not give any significance to the fact that a jury found an aggravating circumstance for which there was *no* evidentiary support, or even something less than substantial evidence, as we have defined it. Is the door not thrown open to arbitrary and capricious imposition of the death penalty? Could the majority have swallowed a verdict in which a jury had, deliberately and conscientiously, given an affirmative answer to the question whether the murder was committed for the purpose of disrupting or hindering the lawful exercise of a governmental or political function?

We say that arbitrary means "decisive but unreasoned" and that capricious defined as "not guided by steady judgment or purpose." *City of North Little Rock* v. *Habrle*, 239 Ark. 1007, 395 S.W. 2d 751. What could be more arbitrary and capricious than finding an aggravating circumstance that did not exist? If we do not require the same degree of proof to sustain a jury verdict on an aggravating circumstance as we require for a finding of guilty, then why do we not? In what kind of position must we put ourselves to accept a verdict not supported by substantial evidence because we understand what a jury meant? Perhaps there are others, who, as I, do not understand it. We have never before upheld a jury's answer to an interrogatory when there was no substantial evidence to support it, just because the jury answered it as they understood it. A jury's answer to a question "as it un-

derstood it" is certainly "decisive but unreasoned," if its understanding was wrong.

I am well aware of the fact that appellant did not object to the instruction given on aggravating circumstances nor to the verdict form including this circumstance; however, this does not bar our review of the sufficiency of evidence when the question has been raised on appeal. I am also aware of the potential argument that an erroneous finding as to one aggravating circumstance should not overturn the verdict because the jury found four aggravating circumstances and no mitigating circumstance.

The flaw in this argument is that it is for the jury, and the jury alone, to impose a death sentence in the first instance, in obedience to statutory guidelines for the exercise of its discretion. It *shall* impose the sentence, if, but only if, it unanimously finds that aggravating circumstances justify a death sentence beyond a reasonable doubt. Ark. Stat. Ann. § 41-1302 (Repl. 1977). Even with the questioned circumstance eliminated, I agree that the evidence justified the requisite findings of the existence of aggravating circumstances and that the three aggravating circumstances supported by the evidence, would outweigh, beyond a reasonable doubt, mitigating circumstances which did not exist. But there was some reason for including the third statutory requisite that the aggravating circumstances must be found to justify a sentence of death beyond a reasonable doubt. How can this court know how much weight the jury gave a non-existent circumstance in deciding that the death penalty was justified? That decision rested entirely with the jury. It is not up to this court to say that because a jury *could have reached its conclusion* on the basis of three, rather than four, aggravating circumstances that it necessarily did.

The state's taking of a human life is a serious matter. This is the reason that we have come to the point where we impose elaborate safeguards to make sure that it is done only in strictly limited types of situations. The mere fact that an appellate court can read a record and say that it thinks a death penalty was justified in a particular case is not an adequate safeguard, any more than the exercise of standardless

discretion by a jury, which is primarily the conscience of the community. The courts can only afford protection against a jury's artibrary or capricious action. There is no way that this court on appellate review of other death penalty cases can properly classify this case in determining whether another death penalty was properly imposed.

I am compelled to register a respectful dissent. Since I find error in the sentencing procedure, I would correct it by reducing the punishment to life imprisonment without parole, unless the state should elect to seek a retrial, in which event, I would reverse the judgment and remand the case for a new trial.

JOHN I. PURTLE, Justice, dissenting. I dissent only from that portion of the opinion which covers Point IX in appellant's appeal. This point covers the aggravating circumstances. I agree that aggravating circumstances one and four as found by the jury were proper. However, I do not agree that the evidence supports finding aggravating circumstances two and three.

I will first discuss aggravating circumstances number two which the jury found to exist. The jury answered yes to the following:

The defendant did, beyond a reasonable doubt, in the commission of the capital felony murder knowingly create a great risk of death to a person other than the victim.

This finding was based upon the theory that the appellant created a great risk of death to the witness, Jim Hudson. Jim Hudson testified that he heard the shots next door and went over to investigate. He stated:

... In fact, I got in the door, had the door pushed open and then right in my face was a black guy and he had a metal box in his hand. Both hands were just carrying it in front of him like this. He was carrying it just like it was a heavy box or something but that is the way he was carrying it. Yes, I am indicating that his fingers were

underneath the object and his thumbs encircling the top.
. . . I recognized that as being his money box . . : He
turned away from the police station, well he had
the gun or he had a gun in his hand. It was more down
to his side. He was glancing from side to side as he went
toward the alley. I would say approximately half way
between the door that he came out of in the alley, he
then stuck the gun in front, apparently in his belt or in
his clothing. And then he run. And he turned up the
alley. . . .

This is the only possible evidence upon which the jury
could have found the appellant created a great risk of death to
a person other than the victim, and it prevents me from agree-
ing that this was a proper finding of an aggravating cir-
cumstance. When the witness encountered the appellant,
both hands were holding a box in front of him. The witness
backed out of the building; and, when he next saw the
appellant, he was leaving the scene of the crime. When he
saw the appellant leaving the scene, the gun was in his hand
down by his side, and then it was placed inside the front of his
belt or in his clothing. The appellant ran away.

At no time was the gun aimed at the witness nor were
any shots fired which could have conceivably struck this
witness or any other person. Therefore, I simply cannot see
that there is enough evidence to support this finding of an
aggravating circumstance.

The second finding of aggravating circumstance which I
disagree with was:

The defendant did, beyond a reasonable doubt, commit
the capital felony murder for the purpose of avoiding or
preventing an arrest or effecting an escape from custody.

By no stretch of imagination can I believe that the
victim was killed for any purpose other than to obtain his
money. The majority concludes that the appellant must have
had thoughts running through his mind that he should kill
the victim to keep from being identified. However, the
aggravating circumstance in this case found that the killing

was for the purpose of avoiding or preventing an arrest or effecting an escape from custody. Certainly, he had not been in custody and could not have been attempting to escape. It is certainly more logical to presume that the appellant thought he would never be identified, and no thought was in his mind of preventing an arrest. It is my opinion that this aggravating circumstance is intended to cover a situation where a person is physically attempting to prevent arrest or trying to escape from custody.

In view of the erroneous findings by the jury of these two mitigating circumstances, I would reduce the sentence to life without parole and return it to the trial court giving the prosecution an option to either concur in the life without parole sentence or retry the appellant.

I am authorized to state that MAYS, J., joins me in this dissent.